Argued May 5, reversed June 2, rehearing denied July 7, 1914.

## STATE *v.* CHILDERS.

(142 Pac. 333.)

**Larceny—Elements of Offense—Ownership of Property.**

One who held a contract for the purchase of cattle for which he was to pay as he gathered them was not the owner of a steer which he had not found nor paid for, and proof of such a contract did not sustain a conviction of larceny of the property as the property of the person holding such contract.

[As to what constitutes larceny, see notes in 57 Am. Dec. 271; 88 Am. St. Rep. 559.]

From Baker: GUSTAV ANDERSON, Judge.

The defendant, James Childers, indicted jointly with John Williams, was tried and convicted of larceny of a steer alleged to be the personal property of one W. J. Densley, and from the sentence imposed appeals.                    REVERSED AND REMANDED.

For appellant there was a brief and an oral argument by *Mr. John L. Rand.*

For the State there was a brief over the names of *Mr. C. T. Godwin,* District Attorney, and *Mr. William H. Strayer,* with an oral argument by *Mr. Godwin.*

In Banc. MR. JUSTICE BURNETT delivered the opinion of the court.

The only testimony on the subject of the ownership of the steer is that of W. J. Densley, which is here set out:

"Q. What, if any, cattle did you buy in the month of June, 1912?

"A. I might have got several bunches. One bunch I bought, the Guyer cattle.

"Q. You say you bought the Guyer cattle. Were these Mrs. Guyer's cattle?

"A. I bought of Mrs. Guyer.

"Q. This particular steer in controversy was one of the Guyer cattle you purchased?

"Yes, sir.

"Q. When did you first see this brockie-faced steer after that?

"A. The first time I saw this brockie-faced steer was down at the stockyards.

"Q. In whose possession?

"A. Mr. Duby's.

"Q. How many Guyer cattle did you buy?

"A. Well, as near as I can tell, about ten head at that time.

"Q. What were they?

"A. Straight yearlings and two year olds.

"Q. All kinds?

"A. Yes, about all kinds.

"Q. Any milch cattle?

"A. No, sir; not at that time.

"Q. When did you say you bought them?

"A. Some time in June.

"Q. What June?

"A. Last year, 1912.

"Q. What time in June?

"A. I should say something about the middle of June; I couldn't say exactly the day.

"Q. When did you receive them?

"A. Well, under the arrangement I made I was to gather the cattle and pay for all I could gather.

"Then you didn't receive them at all?

"A. Not until I found them.

"Q. You paid for nothing until you received it?

"A. No, sir.

"Q. You didn't pay for this steer because you didn't receive it?

"A. No, sir.

"Q. How many did you receive?

"A. I think something like about ten head.

"Q. This one wasn't among them?

"A. This one wasn't among what I received; no, sir.

"Q. Then this steer belonged to Mrs. Guyer that you had contracted for?

"A. Yes, sir.

"Q. You never paid for it since?

"A. No, sir.

"Q. How was that trade made by bill of sale in writing?

"A. No, sir; it wasn't.

"Q. Verbally, was it?

"A. Yes, sir.

"Q. How much per head did you give?

"A. Well, I gave $40 for two year olds, and I guess about $25 for yearlings.

"Q. You bought all their stock on the range, did you?

"A. Yes, sir.

"Q. What was the understanding with Mrs. Guyer as to where you would receive them?

"A. I was to gather the cattle and she was to come over and count them, all I could gather and pay her for all I could gather out of them.

"Q. When were you to gather them?

"A. In the fall, just as soon as I could. I went to get the stock in August.

"Q. Was there anything to prevent you from gathering them at any time?

"A. No, sir; not after I bought them.

"Q. The payment of them was to be made when you got them?

"A. Yes, when I got the cattle.

"Q. You were to pay for these cattle as you received them?

"A. Yes, as I got them; that is, as I found them.

"Q. And unless you received them you were not to pay for them at all?

"A. No, sir; not unless I found them.

"Q. This steer you found but never paid for?

"A. No, sir.

"Q. Why haven't you paid for it?

"A. Because I never received it."

By a request to charge and otherwise, the question was raised in various forms whether this was sufficient proof of the allegation of the indictment that the property was that of Densley. It is said in *Hamilton & Rourke* v. *Gordon,* 22 Or. 557, 559 (30 Pac. 495, 496) :

"As a general rule, where, by the agreement, the vendor is to do anything with the property, for the purpose of putting it into a deliverable condition, or into that state in which the purchaser is bound to accept it, the performance of these things, in the absence of circumstances showing a contrary intention, is taken to be a condition precedent to the vesting of the property in the buyer; and also when goods are sold by weight or measure, and anything remains to be done for the purpose of ascertaining the quantity, in the absence of circumstances showing a different intention, the title does not pass until the goods are weighed or measured."

It is manifest from the testimony in this case that the general property in the steer remained in Mrs. Guyer, and that the utmost that can be claimed for this testimony was that there was an executory contract existing between Densley and her for the sale to him of the cattle of that brand. The number was yet to be ascertained. She had the duty of counting them, and he was to pay for them only when he received them. It is plain that if the cattle died the loss would fall upon Mrs. Guyer and not upon Densley. As taught in *Hamilton & Rourke* v. *Gordon,* 22 Or. 557 (30 Pac. 495), if Mrs. Guyer had refused to deliver the property, or had sold it to someone else, Densley, if damaged, would have had his remedy, but not by an action to recover possession of the property. It is true that the constructive possession of property is in the one holding the general title if nothing else

is shown; but the constructive possession cannot be in two people at the same time, whose interests are adverse to each other. In *State* v. *Cotterel,* 12 Idaho, 572 (86 Pac. 527), it was alleged that the ownership of the mare, the subject of the larceny, was in a man who testified that he owned a band of horses, and had an arrangement with his son that the latter could have one half of what he could gather of the horses. It was held in that case that if there was such agreement this would not constitute ownership in the son until the horses were gathered. In *State* v. *Lackey,* 230 Mo. 707 (132 S. W. 602), a merchant ordered for his clerk from a manufacturing firm through its traveling agent a suit of clothes. The clothing firm made up a suit to the clerk's measure, billed it to the merchant, and delivered it to a common carrier for transportation to the merchant. En route the car containing it was broken into by the defendant, and he was charged with the larceny of the suit, laying the property in the clerk. Although the goods were made for him, and the transaction would have resulted in the end in his being the owner of it, yet the court held that, while the ownership might have been laid in the carrier because it had lawful custody of it, or in the merchant to whom the goods were charged in the first instance and for whom the carrier held it, yet it was error to charge the property to be that of the clerk for whom the suit was made. In *Merrit* v. *State,* 73 Ark. 32 (83 S. W. 330), the defendant was indicted for the larceny of a steer, the property of W. N. Marshall. The proof showed that the animal was the joint property of Marshall and his brother as partners. An effort was made to show that the brother of the one named in the indictment was away from home, and that the partner in whom the ownership was laid had

the exclusive control and special property in the animal named.    The court there said:

"We think that, to sustain the allegation of ownership, there must be proof either of exclusive ownership in the person or persons named, or exclusive possession.    Joint ownership of the person alleged, with one not named in the indictment, even though coupled with special authority to control and manage, is not sufficient, unless accompanied by separate possession. In theory, title to a chattel draws to it constructive possession, unless someone else have actual possession. So it follows that there can be no special ownership in one not having the legal title, without separate possession. * * The jury should have been instructed, as asked by appellant, that the proof must show that W. N. Marshall had the exclusive possession of the property at the time it was alleged to have been stolen. The modification whereby the jury were told that the 'right of exclusive possession and control,' etc., was not sufficient to meet the requirement."

So, here, the mere fact that Densley had the right to go upon the range and take possession of the cattle for the purpose of having Mrs. Guyer count them would not confer upon him any property either general or special until he actually exercised that right and took custody of the cattle.    Not having possession, he was neither bailee nor general or special owner of the property.    As to the steer in question, he only had an unused option to purchase him.    Indeed, having the right to purchase as many cattle as he could gather, if Densley had taken up some of them and disposed of them without the knowledge of Mrs. Guyer and without paying for them, he would have been guilty of larceny himself within the meaning of *Rex* v. *Tideswell,* 1 B. R. C. 997 (21 Cox C. C. 10).    There the defendant had the right to take ashes from the works of a manufacturing

concern, paying for the amount he took. He carried away 32 tons and accounted for only 31 tons and was adjudged guilty of larceny for so doing. The variance between the allegation and proof is fatal to the indictment.

It is unnecessary to· notice the other errors assigned.

The judgment is reversed for further proceedings.

REVERSED.   REHEARING DENIED.

MR. JUSTICE BEAN delivered the following dissenting opinion.

I think the proof shows sufficient special or conditional ownership of the steer alleged to have been stolen to sustain a verdict of guilty. The indictment alleges the steer, the subject of the larceny, to be the personal property of W. J. Densley. He was called as a witness on behalf of the state, and, in support of the allegation of ownership, testified in substance that he bought the cattle of Mrs. Guyer in June, 1912, and that the steer in question was one of them; that they were branded on the right hip with a Catholic cross and a bar under it, and were running on the range in the Sparta country; that he was to pay for the cattle when he found them at a certain sum per head; that he went to gather them in August, 1910, and got ten head, but did not find the steer; that about October 22, 1912, he inquired of the defendant about this animal and told him that he bought the Guyer cattle and was out one bald-faced steer (meaning the one described in the indictment); that the defendant told him that he knew the Guyer cattle but had not seen the steer. On cross-examination Densley stated that he had not paid for the steer and that it belonged to Mrs. Guyer; that he was to pay for all he found.

It is clear from the evidence that Mrs. Guyer, the original owner of the animal in question, parted with her right of possession of the cattle and steer, and delivered it to Densley in so far as she could deliver possession of cattle running on the range. Thereafter Densley exercised rights of ownership over the steer and had the right to authorize the defendant or anyone else to take possession of the animal. The only thing that remained to be done was to ascertain the number of cattle purchased for the purpose of measuring Mrs. Guyer's compensation and liquidating the same. The steer was taken from the constructive possession of Densley. It is very doubtful if in an indictment the ownership of the steer could be laid in Mrs. Guyer. Of course, it is not necessary, in order to sustain an indictment for larceny, that absolute ownership in the alleged owner should be proved.

Mr. Wharton, in his work on Criminal Law, Volume 2 (11 ed.), Section 1170, says:

"To sustain an indictment for larceny, the goods alleged to have been stolen must be proved to be either the absolute or special property of the alleged owner, provided that such owner be not technically the defendant. * * But it is not necessary that the alleged owner should be legally entitled to hold the property. It is enough if he in any sense have title."

On the subject of ownership, in a note on the same page, we find the following from Sir J. F. Stephen (Digest Crim. Law, Art. 281):

"A movable thing is said to be in the possession of a person when he is so situated with respect to it that he has the power to deal with it as owner, to the exclusion of all other persons, and when the circumstances are such that he may be presumed to intend to do so in case of need."

Section 1177 of 2 Wharton, Criminal Law states:

"Whenever a person has a special property in a thing, or holds it in trust for another, the property may be laid in either, and 'every person to whom the general owner of a movable thing has given a right to the possession as against the general owner is said to be the special owner thereof, or to have a special property therein. * * ' "

Upon the question of ownership of goods, the subject of larceny, in 2 Russell, Crimes, page 258, it is stated:

"There is no doubt that there may be a sufficient ownership of the goods stolen in a person who has only a special property in them, and that they may be laid as the goods and chattels of such person in the indictment. * * "

Stating the true legal distinction which governs cases of this nature, the author quotes:

" 'If the owner parts with the right of possession for a time, so as to be deprived of the legal power to resume the possession during that time, and the goods are stolen during that time, they cannot be described as the goods of such owner; but if the owner parts with nothing but the actual possession, and has a right to resume possession when he thinks fit, the goods may be described either as his goods, or his bailee's. In the latter case he does not for an instant part with the general right of possession. * * ' "

See *State* v. *John Harmon,* 104 N. C. 792 (10 S. E. 474).

It is stated in 25 Cyc., page 35:

"Since the thief is required to take possession, it follows that if larceny is committed the thief must take from some person who was previously in possession. All personal chattels which are not abandoned are supposed by the law to be in the possession of some person, and, if such possession is not actual, a possessor must be found by construction of law."

Mr. Underhill, in his work on Criminal Evidence (2 ed.), section 294, says in part:

"Possession of personal property is primary evidence of ownership, if it appears that the alleged owner exercised exclusive control, possession and management over it. An absolute ownership need not be proved."

1 McClain, Criminal Law, Section 546, reads in part:

"As will appear in a subsequent section under the head of indictment, the name of the owner of the property must be alleged and proven as alleged. It cannot be charged as the property of a person who has never had either actual or constructive possession of it. But possession need not be actual; it may be constructive only. Thus, cattle at large may be deemed in the possession of the owner. * * A general allegation as to ownership of the property will be supported by proof of a conditional ownership."

In the case of *State* v. *Charles Pettis,* 63 Me. 124, the complaint was made of the larceny of one cradle of the goods, chattels, and property of Charles A. Dalton. At the trial before the Superior Court, the government called but two witnesses: Eliza J. Googins, who testified that the cradle was hers, that she lent it to Phebe Dalton to whom she partly bargained it for 50 cents, and that afterward she saw it newly painted at Pettis' house; and Phebe Dalton, who stated that her husband was Charles A. Dalton, that she borrowed the cradle of Mrs. Googins, and left it in their house with the rest of their furniture when they went away. With regard to the ownership of the cradle, the jury were instructed that, although the general property was in Mrs. Googins, yet "if the property had been loaned to Dalton, and was in his possession under a loan, especially if there was some contract for sale existing between the parties,

then there is sufficient evidence to sustain the allegation that the cradle was the property of Charles A. Dalton.'' On appeal Mr. Justice DICKERSON said:

"The allegation of property in a complaint for an alleged larceny of goods is sustained, if the complainant at the time the larceny was committed, held possession of them under a loan from, or contract of sale with the owner."

It is a well-recognized principle of law that a domestic animal is in possession of its owner when on its accustomed range: *Jones* v. *State,* 3 Tex. App. 498; *Huffman* v. *State,* 28 Tex. App. 174 (12 S. W. 588); *McGrew* v. *State,* 31 Tex. Cr. 336 (20 S. W. 740). See, also, *Commonwealth* v. *Butts,* 124 Mass. 449. I think the animal described in the indictment, while on the range at the time it was stolen, was in the constructive possession of Densley, the special owner who had the right of control and dominion over it, and exercised the same. In the parlance of the stockmen "he bot the brand." Such purchases of livestock are often made, and the stock allowed to run on the range for a long time afterward, without any other change of possession. In *Taylor* v. *State,* 62 Tex. Cr. 611, (138 S. W. 615), the alleged owners, who had no contract for the purchase, had no better possession than Densley had of the steer in question. At page 614 of 62 Tex. Cr., 138 S. W. 617, it is stated as follows:

"Appellant complains that the proof does not show that the property was in possession of the alleged owners, and, if so, their control was not such that ownership could be alleged in them. The proof is that the cattle were the property of Sarason Guedry. The ownership is alleged in John Brown and L. Carr. Harb Whittington testified: 'John Brown and L. Carr had charge of Guedry's cattle.' L. Carr testified: 'I have charge of Sarason Guedry's cattle. There is

someone assisting me and in charge, also; it is John Brown.' John Brown testified: 'I have charge of Sarason Guedry's cattle. After I came down there, me and L. Carr had charge of them.' They were cattle on the range, and the owner had these gentlemen in charge of them, looking after them, branding the increase, etc. They testified that neither of them gave their consent to defendant taking the property.''

It was held that the evidence supported the verdict.

The word ''delivery'' in the law of sales may signify either an actual or a constructive delivery. Actual delivery consists in giving to the buyer or his servants or accredited agent the real possession of the goods sold. Constructive delivery comprehends all of those acts, which, although not truly conferring real possession of the goods sold, have been held equivalent to acts of real delivery, and in this sense includes symbolical or substituted delivery. Both actual and constructive delivery contemplate the absolute giving up of the control and custody of the goods on the part of the seller and the assumption of the same by the buyer: 35 Cyc. 188, 189.

Upon the question of ownership of the steer the trial court instructed the jury as follows:

''Evidence has been introduced calculated to show a sale claimed to have been made by one Mrs. Guyer of what has been referred to as the Guyer cattle, to W. J. Densley, at some time prior to the time of the alleged larceny, and on this feature you are instructed that if you believe from the evidence that a contract of sale of cattle owned by Mrs. Guyer was entered into for the sale to W. J. Densley of her cattle, and that said Mrs. Guyer was then the owner thereof, including the steer in question, and that in and by such contract the parties thereto agreed and intended that said Mrs. Guyer then sold and permanently relinquished and gave to said Densley the right to take possession of said steer as owner thereof on the range or

wherever found, and that such sale was made upon an agreed purchase price for said animal, then if you find from the evidence that such were the facts as to the intention and transaction of said parties, the same would constitute constructive delivery of possession of such steer, and said Densley would, under such state of facts as far as pertains to this case, become the owner regardless of whether the purchase price of said steer has been paid or not; but, if Densley's right to permanent possession or ownership was dependent upon payment of the price before such right should exist, then there would be a failure of proof of the allegation of ownership in which event it would be your duty to acquit."

By this instruction the question was fairly and properly submitted to the jury.