### Ex parte LA PAGE.

### In re LA PÁGE et al.

(District Court, N. D. New York. August 17, 1914.)

1. EXTRADITION (§ 14*) — PROCEEDINGS FOR EXTRADITION — SUFFICIENCY OF EVIDENCE.

In extradition proceedings instituted for the purpose of taking a citizen and resident of the United States to Canada or Great Britain for trial for a crime there committed, evidence must be produced that a crime was committed and that there is reasonable ground to believe accused guilty of the offense.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 15, 16; Dec. Dig. § 14.*]

2. EXTRADITION (§ 14*) — PROCEEDINGS FOR EXTRADITION — SUFFICIENCY OF EVIDENCE.

In a habeas corpus proceeding by a citizen of the United States sought to be extradited to Canada for trial for the larceny of a calf, a turkey gobbler, and a number of hens, evidence as to accused's guilt held insufficient to justify his extradition.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 15, 16; Dec. Dig. § 14.*]

3. LARCENY (§ 64*)—EVIDENCE—POSSESSION OF STOLEN PROPERTY.

While the possession of recently stolen personal property is some evidence that the possessor is the thief, such possession must be a conscious possession, and, where the evidence makes it at least just as probable that the stolen property was placed on the premises of the suspected party by some one else, the presence of the property on his premises has no probative force.

[Ed. Note.—For other cases, see Larceny, Cent. Dig. §§ 170–178; Dec. Dig. § 64.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Application for the extradition of Joseph La Page and others under the treaties between the United States of America and the Kingdom of Great Britain, and petition by Joseph La Page for writ of habeas corpus. Writ sustained, and petitioner discharged.

On examination before a United States commissioner, the defendant Joseph La Page having been held for action by the State Department in deportation proceedings to answer in the Dominion of Canada for an alleged crime, alleged to have been there committed by him, said La Page sues out this writ on the claim that the evidence is wholly insufficient to justify his being held and subjected to imprisonment, etc.

John P. Kellas and Le Roy M. Kellas, both of Malone, N. Y., for petitioner.

Charles Fox, of New York City, for Consul General.

RAY, District Judge. [1] It is fundamental in extradition proceedings instituted for the purpose of taking a citizen of the United States, residing here, to Canada, or any part of Great Britain, for trial there on the claim that such citizen has committed a crime there (one within the treaty and laws), that such evidence must be produced as shows, first, that a crime was committed there, and, second, that there is at least reasonable ground to believe that the person sought to be deported is guilty of the offense charged.

[2] One James Arnold, a resident of Godmanchester in the Dominion of Canada, asserts that on the 27th and 28th days of May, 1914, he was the owner of some 70 Plymouth Rock hens, a grade Ayshire heifer calf, and a large turkey gobbler, and that the gobbler and hens were locked up for the night in his henhouse. Also, that on the morning of May 28th, between 3 and 4 o'clock he discovered that the calf (one of five) had been stolen, and then or a little later that the gobbler and a number of his hens had been stolen. The evidence is sufficient to establish that this property was missing.

This witness also states that on the morning of May 28, 1914, between 3 and 4 o'clock a. m., he arose and went to the barn and discovered that the calf was missing; went to the highway some distance away where the bars were partly down, and found the footprints of men, those of more than one, those of a pair of horses, and also wheel tracks, and these showed the team had been standing there some time; and that he then called his wife. She corroborates this part of his evidence, and also the allegation that the henhouse had been broken into. He also says the wheel and other tracks indicated the wagon came from the north and went south. The defendants arrested resided southerly from Arnold some five miles distant. He says that in his wagon he followed these tracks to the home of La Page; that there was a heavy dew, and he followed the track around the La Page house and to his barn. Whether there was any track leading away from the barn and further out does not appear, and he did not note and could not tell whether or not the horses that drew the wagon were shod all round. It does not appear whether or not any road turns off from the one in which for miles he says he followed this track driving as fast as he could. To corroborate this the sheriff, who got there

216 F.—17

later, says that when he reached La Page's he (La Page) was putting thills on his milk wagon and that the pole looked as though recently used. How recently did not appear. Also, that one of the horses in the barn was wet with sweat and one witness said "panting." This horse was shod in front only, and if its tracks had been followed some four miles this fact would have been observed. The evidence was uncontradicted that that particular horse had been out the night before (the 27th) for drawing potatoes and not cleaned. Also, that this morning of the 28th and just before the arrival of the sheriff at least for 1½ to 2 hours after La Page drove over the road, if he did, this horse "wet with sweat and panting" had been driven (unhaltered) with another from the pasture into the barn; that they were loose and for some 10 or 15 minutes ran up and down the highway for some distance; also, that this one had been rolling in the wet grass. All this was shown by members of the family and by a neighbor.

If one of the horses was wet with sweat and panting from being driven some miles drawing a wagon, the other would have showed some signs of having been driven. But the evidence and circumstances show clearly that the "wet with sweat" and "panting" of the horse could not have been caused by being driven on the road attached to a wagon that morning or night. The interval of time between being so driven, if so driven, and when seen by these witnesses, was such that the "sweat" must have dried off and the "panting" must have ceased. But the running up and down the road when being driven in from the pasture fully accounts for this condition. The marks of the saddle of a harness on the back of a horse used will remain a long time unless the horse is curried or brushed so as to remove them. The evidence altogether, instead of showing that La Page's horses, or either of them, had been driven on the road that night of May 27–28, or in the early morning of the 28th, drawing the wagon making wheel tracks claimed to have been followed by Arnold by means of the tracks, shows the contrary. There was no evidence that the highway was wet with rain or dusty, or that there were not other wagon tracks on it, or that the tracks followed to the barn of La Page did not then pass on. But a neighbor of La Page saw Arnold on his way driving towards La Page's residence, and when Arnold asked where La Page lived or whose house it was on ahead, and on La Page's house being pointed out Arnold said that was where he was going. This evidence of the wagon tracks and sweating and panting horse, in view of the other known, proved, and conceded facts, is worthless as tending to fix this larceny on La Page.

The sheriff and others came almost immediately on the arrival of Arnold at La Page's residence, and a strict and thorough search of the entire premises of La Page was made, including woods, lots; barns, and home, and well in the barn, both inside and out, and no objection was made to such search and no obstacle interposed. Nothing was found. No stolen property was there discovered; no suspicious circumstance, aside from the alleged sweating horse, then existed. The La Page family went about its business. But Arnold and several others were on the watch on the premises all day and all the evening

and night of the 28th. There was a well in La Page's pasture some six rods from the house and three rods from the pig pen. This was in plain sight and was not, so far as appears, investigated on the 28th but may have been. During the night of the 28th and 29th the attention of two sons of La Page was attracted to the squawking of a goose near the pig pen indicating a movement of these people who were lingering about the premises, or of other persons. These young men went in that direction and found a person in the immediate vicinity of the well who could not be identified on account of the darkness, and on being approached this person ran rapidly away, and the sons were unable to catch him. It cannot be successfully contended that this was a made-up story. Arnold with his crowd was about, and no one of them was called by the prosecutor to deny. Indeed, it was not shown who these night visitants remaining about the premises that night were. It is evident they were hostile. They were not placed there by the sheriff.

The next day at the instigation of some one there was a research. A body of men was arranged in line and advanced, and when this well was reached a pole with a hook was produced and the turkey gobbler pulled from the water in the bottom of the well. It is strange indeed that this well was not searched or probed the day before when the other was. Feeling out wells was in the mind of the searching crowd that day and all this ground was gone over. The well beyond the pig pen was not concealed. As the La Page family had been under constant surveillance from daylight in the early morning of the 28th, no one of the family had had time or opportunity to place the gobbler in the well. If La Page stole the gobbler, he stole the calf and hens, and the query is what has become of them? A slight attempt was made by Arnold to state that he identified about 11 p. m. by the light of a lantern a hen at roost in La Page's henhouse as one of his by the color of the feathers around its neck. As this hen was shown to have had at the time a brood of chickens, this identification of the one hen is too uncertain to demand any consideration. There was no evidence to show any addition in number to La Page's hens. He was and is a farmer, and that he owned hens of his own of this breed or variety was not questioned. It is more than probable that during the night of May 28–29, the actual possessor of calf, hens, and gobbler placed the latter in La Page's well to divert suspicion from himself or themselves.

[3] The possession of recently stolen personal property is some evidence that the possessor was the thief, and its probative force depends on the attending circumstances. But such possession must be a conscious possession, or possession under such circumstances as to show that the possessor knew it was on his premises, and when the proof shows that it was just as probable, or, as here, more probable, that the stolen property was placed on the premises of the suspected party by another or others, the mere presence of the property on the premises has no significance. George La Page, a married son of Joseph La Page, lived with his family a mile away across the lots, but more than that by the road. While Arnold was at La Page's in the

early morning of the 28th, he saw George come around the barn from the direction of his home with a lantern. He was arrested. The evidence shows he was at his father's the evening before; that at 11 p. m. he went home across the lots, much the nearer way, and, it being very dark, that he borrowed this lantern; that he was home all the remainder of the night, and the morning of the 28th was on his way to a neighbor where he was working and stopped to leave the lantern. He was discharged. La Page has two other grown-up sons who reside with their father, and all were at home the night of May 27th and 28th. The evidence of Arnold and his wife was that there were tracks of men, not of a man, at the barn where the horses stood. If La Page was at Arnold's the night and morning of the 27th and 28th of May, it must be his sons, or one of them, was with him; but both were discharged. The defendant Joseph La Page was evidently held and his deportation sought for the reason he owned the farm on which is situated the well in which the gobbler was found the second day after the theft and after a posse of unfriendly people had been in possession practically of the farm and well for a day and a night and after a day's unavailing search had been made.

This was not the possession of stolen property such as alone will justify either conviction or deportation to Canada for trial. See 1 Wigmore on Evidence, p. 211, §§ 152 and 154; Commonwealth v. Harry Bell et al., 102 Mass. 163, 165. Neither actual personal possession nor possession with knowledge of such possession by the defendant is shown, nor did he have the actual possession of the place where the gobbler was found for the preceding 24 hours during which time it was in the possession of those seeking to fix on him the crime of the larceny of the gobbler and through that the stealing of the calf and hens and the breaking into the henhouse. When taken from the well, the gobbler was in a bag or sack used by merchants in selling a certain kind of merchandise. The defendant had such bags, but substantially any farm and all farmers might have them. These people around the defendant's premises could have taken one or could easily have procured it elsewhere. It was not shown to have been defendant's bag or sack. It may have been and it may not have been. The evidence against the two sons residing at home was just as strong as that against Joseph La Page, and yet they were discharged.

The writ is sustained, and defendant discharged.