Argued April 4, reversed and remanded June 17, petition for rehearing filed July 14, rehearing granted August 23, 1919, reargued *in banc* February 5, original opinion reaffirmed with modification March 30, 1920.

## STATE *v.* MOSS.*

(182 Pac. 149; 188 Pac. 702.)

**Larceny—Indictment—Variance.**

1. Where plaintiff was indicted under Section 1950, L. O. L., denouncing the crime of larceny by stealing cattle, the indictment must be considered solely with reference to that offense, and a conviction cannot be sustained on proof that defendant, in violation of Section 1954, knowingly defaced brands on cattle.

**Animals—Brands—Presumption of Ownership.**

2. Under Laws of 1915, page 44, Section 8, declaring that the brand of any animal shall be *prima facie* evidence that the animal belongs to the owner of the brand, where there are two recorded brands upon the animal, the presumptions balance each other.

**Larceny—Burden of Proof.**

3. In a prosecution under Section 1950, L. O. L., for larceny of cattle, the state has the burden of proving that the cattle were property of individuals named as owners in the indictment, and that defendant took or asported the animals.

---

*On the question of brands as evidence of ownership of cattle, see note in 11 **L. R. A. (N. S.)** 87.    REPORTER.

**Larceny—Evidence.**

4. In a prosecution under Section 1950, L. O. L., for the larceny of cattle, where it appeared that the animals defendant was charged with stealing were on open range, *held* that, though brands thereon had been obliterated, etc., and though defendant and his hired man were in proximity to the cattle which were with a larger number admittedly belonging to defendant, such facts did not show an asportation.

## ON REHEARING.

**Larceny—Finding of Defendant's Brand upon Animal Stolen Insufficient in Itself to Justify Conviction.**

5. The finding of one man's brand upon another man's cow is *not alone sufficient to justify a conviction of larceny.*

[As to brands on animals as evidence of ownership, see notes in 12 Ann. Cas. 414; 18 Ann. Cas. 544; Ann. Cas. 1913E, 133.]

**Larceny—Evidence That Defendant's Brand is upon Stolen Cattle is Admissible.**

6. In a prosecution for larceny of cattle, evidence that defendant's brand is found upon the animals alleged to have been stolen, with or without a disfiguration of the old brands, is admissible.

**Criminal Law—What Deemed "Evidence to Support Verdict"— "Satisfactory Evidence."**

7. The mere existence in a criminal case of any competent evidence, however conclusive, any circumstance, however remote, which a jury would have a right to consider if submitted along with other evidence, is not "evidence to support the verdict" within the constitutional provision, in view of Section 697, L. O. L., providing that evidence is deemed satisfactory which ordinarily produces moral certainty and conviction in an unprejudiced mind, and that such evidence alone will justify a verdict.

**Larceny—Evidence Held Insufficient to Show That Defendant Placed His Brand upon Stolen Cattle.**

8. In a prosecution for larceny of cattle, that about 300 of the stolen animals were found in one small valley on a public range used by defendant as a sheep range, that defendant's employee was seen in the vicinity, and that the cattle bore defendant's brand, was insufficient to connect defendant with the branding.

**Criminal Law—Authority to Commit Crime not Inferred from Employment of Agent by Defendant.**

9. Authority to commit a criminal act can never be inferred from the mere fact that the alleged agent was in the lawful employ of defendant.

**Criminal Law—Admission of Ownership Held Insufficient to Show That Accused Disfigured Brands on Stolen Cattle.**

10. In a prosecution for larceny of cattle which had been found carrying defendant's brand apparently superimposed upon an older brand, the mere fact that defendant said he thought some of the cattle were his was insufficient to connect him with the disfigurement of the brands.

Animals—Presumption Arising from Brands Stated.

11. Where two brands are found upon an animal, one older than the other, the presumption from the brands alone is that the owner-ship of the animal belongs to the older brand, and ordinarily under such conditions the burden is upon the owner of the later brand to establish his right to put such brand upon the animal.

Criminal Law—Cattlemen Could Testify as Experts as to Brands upon Animals Stolen.

12. In a prosecution for larceny, where defendant's brand had been found superimposed upon another brand on the animals stolen, it was not error to permit old cattlemen of long experience to testify as experts in relation of the growth of brands with the growth of the animal and the effect of a second burn on the old scar.

Criminal Law—Instruction as to Effect of Brands to Show Ownership Held Erroneous as Invading Province of Jury.

13. In a prosecution for larceny of cattle, an instruction that, if the company claiming to be owner of the stolen animals had "placed its brand on any of the animals, it is sufficient evidence" that the animals belonged to it, was erroneous as invading the province of the jury.

Larceny—Evidence as to Possession of Stolen Goods Admissible, Although not Recent or Exclusive.

14. In larceny cases the fact of possession of the stolen goods by defendant is admissible, notwithstanding such possession is not recent or exclusive, although such fact may not in itself be sufficient to raise a presumption of guilt.

From Lake: L. F. CONN, Judge.

Department 1.

The defendant was indicted for the larceny of two steers, seven cows and one calf, all branded and said to be owned by different parties, two of whom had a recorded brand. We condense the statement following from the brief for the state, supplemented by some of its testimony: The defendant himself was the owner of several hundred head of cattle which with the animals mentioned in the indictment and still others owned by other and different parties were ranging on a tract in the forest reserve, the pasturage of which had been allotted to the defendant. Those in dispute were collected by an inspector of brands and his assistants. Six heads of them were taken from a band of about

three hundred others of which it was estimated four fifths were the property of the defendant and the remainder belonged to other individuals without dispute. The other four were found at large in the same neighborhood.

There was evidence to the effect that most of the ten head mentioned in the indictment had on them mutilated brands of the alleged owners and the brand of the defendant as well. The cattle in question were taken by the inspector to Lakeview and kept there in custody of the sheriff pending the trial of the defendant. When the inspector went into the country where the cattle were feeding he met a man named Silvers, said to be the defendant's employee, about half a mile from the herd. There was testimony to the effect that Silvers had been sent there by the defendant to build a corral into which to put his calves during the weaning period and that the defendant himself had also gone there to instruct Silvers where to build the enclosure. Two witnesses testified to the effect that when the cattle had been brought to Lakeview the defendant was asked concerning them and said, "Some of them are mine." Respecting the range where the cattle in question were found, the following excerpt from the testimony of John Allen, a witness for the state, is here set down:

"Q. What is the nature of the country in general, between Sherman Valley and where they had these cattle?

"A There is just cattle trails between the south fork and that, a kind of a rim, a rocky rim with trails—

"Q. Can cattle pass from one place to another?

"A. Yes, sir.

"Q. Was that in a little valley where they had them?

"A. Yes, sir; in between the two mountains.

"Q. Approximately how large is Sherman Valley, if you can give us an idea, how far across it? Just to give us a general idea.

"A. I should judge there is two or three hundred acres in Sherman Valley, what they call Sherman Valley meadow. * *

"Q. Do you know anything about whose range that is, whether it is under lease, or anything about that?

"A. Yes, sir.

"Q. Whose is it?

"A. Anybody's that runs cattle on the reserve.

"Q. Anybody that gets a permit can run cattle there?

"A. Yes, sir. * *

"Q. The cattle don't know who has a permit, do they?

"A. No, sir.

"Q. The range is not fenced in?

"A. No, sir.

"Q. Any of the cattle that are out on the public range, outside of the Forest Reserve, can get in there if they want to?

"A. Yes, sir.

"Q. Do you know whether it is the habit of cattle to follow other cattle in the hills, and congregate together?

"A. Yes, sir.

"Q. That is their habit?

"A. Yes, sir.

"Q. Do you know whether these cattle, at the time you saw them, were on the Forest Reserve, or off?

"A. On.

"Q. Know where the Forest Reserve lines are?

"A. Yes, sir.

"Q. The Forest Reserve line there runs almost directly north and south, doesn't it, the exterior line on the east side?

"A. Right down below, I think it does, it jogs on the way there, though.

"Q. It may jog on a section line, or something of that kind, but the general course is north and south?

"A. Yes, sir.

"Q. Off on east of that, what is it, the general country east, as to being open public range, or being fenced up?

"A. It is all open public range all through there.

"Q. Is there any obstruction of any kind to keep cattle from going right on to the Forest Reserve?

"A. No, sir; only around the meadows, is all.

"Q. Whenever a man has a small ranch or meadow fenced, that is the only fenced land?

"A. Yes.

"Q. And cattle turned loose on the public range can go right on the Forest Reserve if they wish to?

"A. Yes, sir.

"Q. What do you say as to whether there are good trails between the public range and the Forest Reserve, showing cattle travel them?

"A. There are trails all through there. * *

"Q. During the summer, prior to the time these cattle were found there, did you see cattle of other people besides those you have mentioned, on that range?

"A. Yes, I was up about twice this summer, or three times, that I went through, before that, and I run on quite a bunch of cattle before that.  Saw cattle when I was up there, always do in the summer time.

"Q. It is not a range that is set aside for Mr. Moss?

"A. No, sir.

"Q. All of the people who run cattle in the neighborhood find cattle on the range in that locality right along?

"A. Yes, sir."

All the other witnesses for the state who spoke on that subject agree with Allen.

The only testimony in support of the allegation of ownership of any of the cattle as laid in the indictment is derived from brands and changes and obliterations of them.  No witness testified who identified them except by brand, or imputed to the defendant any actual knowledge of the presence of the cattle on his range or

intimated that he was ever seen in their neighborhood, or ever applied any brand to them.

From a judgment on a verdict of guilty as charged, the defendant appealed.     REVERSED AND REMANDED.

For appellant there was a brief over the names of *Mr. Herbert P. Welch* and *Messrs. McCamant, Bronaugh & Thompson,* with an oral argument by *Mr. W. Lair Thompson.*

For the State there was a brief over the names of *Mr. George M. Brown,* Attorney General, *Mr. T. S. McKinney,* District Attorney, *Mr. C. H. Leonard* and *Mr. Lionel R. Webster,* with an oral argument by *Mr. Brown.*

BURNETT, J.—1, 2. There are numerous assignments of error, but we shall consider only one of them, that challenging the sufficiency of the evidence to sustain a conviction.   The defendant was indicted under Section 1950, L. O. L., reading thus:

"If any person shall commit the crime of larceny by stealing any horse, gelding, mare, mule, ass, jenny or foal, bull, steer, cow, heifer, hog, dog or sheep, such person, upon conviction thereof, shall be punished by imprisonment in the penitentiary not less than one nor more than ten years, or by imprisonment in the county jail not less than three months nor more than one year, or by fine of not less than $50 nor more than $1,000."

There is another statute, Section 1954, L. O. L., which is here quoted:

"If any person shall willfully and knowingly make, alter or deface any artificial earmark or brand upon any horse, mare, gelding, foal, mule, ass, jenny, sheep, goat, swine, bull, cow, steer or heifer, the property of another, with intent thereby to convert the same to his

own use, such person shall be deemed guilty of larceny, and upon conviction thereof shall be punished by imprisonment in the penitentiary not less than one nor more than five years.''

As the indictment is drawn under the former section, it must be considered solely with reference to that standard, for, as taught in *State* v. *Howard,* 41 Or. 50 (69 Pac. 50), the two offenses are distinct and a conviction cannot be had under an indictment charging one offense when the evidence points exclusively to the other. There is no evidence in the record of any actual asportation of the property from the custody of the true owner. As stated, all the evidence of property rests upon the testimony concerning the presence of mutilated brands on the animals listed in the indictment. It is said in Section 8 of Chapter 33, Laws of 1915:

''In all suits at law or in equity, or in any criminal proceedings, when the title or right of possession is involved, the brand of any animal shall be *prima facie* evidence that the animal belongs to the owner or owners of the brand, and that such owner is entitled to the possession of the animal at the time of the action; *provided,* that such brand has been duly recorded as provided by law.''

So far as this statute is concerned, without reference to the presumptions of innocence, regularity of private transactions and the like and confining ourselves to the mere presence of a brand upon an animal which is all the statute deals with, the same presumption must affect any brand coming within the purview of the enactment, viz., a recorded brand found upon the animals in question. The statute says nothing about age or priority of brands and in construing it or giving value to the *prima facie* presumption it creates, we cannot read into the law anything of that kind. Viewing the

matter, therefore, from the statutory standpoint, when
we find two recorded brands upon a cow the presump-
tions arising from them balance each other and the
state must produce something to disturb this equipoise
adversely to the defendant, if it would prove the prop-
erty to be that of another, or that the defendant stole
it. The prosecution relies upon the testimony about
discovering the cattle mentioned in the indictment in
company with defendant's herd and still other cattle
on the public domain where all cattle indiscriminately
in that region could and did range. They were not in
the actual custody of the defendant, neither is there
any evidence tending to show that they ever were in
his actual control. The question then is whether such
testimony is sufficient to turn the scale against the de-
fendant.

3. Much stress was laid also in argument upon the
testimony about the mutilation and changes of brands
upon the animals in question, the comparative ages of
different brands on the same animals, the earmarks
and dewlaps, and the like; but all this only goes to
affect the question of property of someone in the cat-
tle in dispute. The state had the burden of proving
that the animals in question were the property of indi-
viduals named as owners in the indictment. Its task
did not end there. It was compelled to go further and
prove the other essential element, that the defendant
took the cattle. We may safely say that there is tes-
timony sufficient to go to the jury that the individuals
named in the indictment owned the cattle described
therein and that someone changed or effaced their
brands and put on other brands and marks, but there
is no evidence in the record that the defendant is that
someone who made such changes either in person or by

an agent.   This constitutes a hiatus in the case that
is fatal to the prosecution.

4. It will not fill the gap to show that the defendant
or his employee was in the vicinity where the cattle
ranged.   They both had a right to be there.   In *State*
v. *Odell,* 8 Or. 30, it was decided that proof that the
prisoner was in the same town about the time of an
alleged larceny in a store is not alone sufficient to cor-
roborate the testimony of an accomplice or warrant a
conviction, and it is the duty of the court so to instruct
the jury.   If such circumstances will not corroborate
an accomplice who made a clean breast of his connec-
tion with and the participation of the defendant in the
commission of the crime charged, by a parity of reason-
ing similar testimony adds nothing to the state's case
against the present defendant.   *State* v. *Odell,* 8 Or.
30, was approved in *State* v. *Townsend,* 19 Or 213 (23
Pac. 968), but was distinguished in the latter case on
the ground that the defendant's presence near the scene
of the crime was connected with suspicious circum-
stances, among which were that it was unusual for him
to be in that vicinity; that he was there under an as-
sumed name and that he was acting in concert with the
other defendant, who avowed his own guilt.   The Odell
case was approved and followed in *State* v. *Scott,* 28
Or. 331 (42 Pac. 1), which teaches that mere oppor-
tunity to commit adultery is not sufficient to corrobo-
rate the woman who gave a detailed account of her
adulterous liaison with the defendant when they were
spending the day together in the woods where she af-
fected to be hiding from her husband and the defend-
ant was ostensibly fishing.   Other parties saw them in
the woods together and on the next day, according
to the declarations of other witnesses, they went to
Portland on the same train.   Mr. Justice MOORE quotes

95 Or.—40

with approval this excerpt from 1 Roscoe's Cr. Ev., page 133:

"What appears to be required, is that there shall be some fact deposed to independently altogether of the evidence of the accomplice, which, taken by itself, leads to the inference, not only that a crime has been committed, but that the prisoner is implicated in it."

The deduction is that the mere presence of the defendant or his hired man on the range where his cattle and those mentioned in the indictment were being pastured and where both of the men had a right to be, is not a circumstance sufficient to establish the asportation of the animals included in the charge, which were all the time ranging there.

Whether or not it is a happy expression to speak of balancing the statutory presumptions arising from the presence of two or more brands upon an animal, it refers only to the proof of ownership of the cattle. In the absence of any testimony competent to show that the defendant branded any of them or aided or abetted in such branding, it cannot affect the element of asportation so requisite to constitute larceny.

It is said in 17 R. C. L., page 73:

"The general rule that the possession of stolen property is evidence of guilt is limited by the rule that to warrant an inference of guilt it must further appear that the possession was personal, and that it involved a distinct and conscious assertion of possession by the accused. It would be pushing the rule too far to require of one accused of a crime an explanation of his possession of the stolen property, when such possession could also, with equal right, be attributed to another. Hence the mere fact of finding stolen articles on the premises of a man of a family or in a place in which many others have free access without showing his actual conscious possession thereof discloses only a *prima facie* constructive possession and is not such a

possession as will justify an inference of guilt by reason thereof."

Similar language is found in Underhill on Criminal Evidence (2 ed.), Section 33.

The following excerpt is taken from *State* v. *Ford,* 175 N. C. 797, 801 (95 S. E. 154, 155):

"In *State* v. *Graves,* 72 N. C. 485, Pearson, C. J., says that the presumption does not arise except when 'the fact of guilt must be self-evident from the bare fact of stolen goods, and Hoke, J., in *State* v. *Anderson,* 162 N. C. 571 (77 S. E. 238), that it is only when he could not reasonably have got possession unless he had stolen them himself.' The principle is usually applied to possession which involves custody about the person, but it is not necessarily so limited. 'It may be of things elsewhere deposited, but under the control of a party. It may be in a storeroom or barn when the party has the key. In short, it may be in any place where it is manifest it must have been put by the act of the party or his undoubted concurrence': *State* v. *Johnson,* 60 N. C. 237 (86 Am. Dec. 434)."

In *People* v. *Hurley,* 60 Cal. 74 (44 Am. Rep. 55), the syllabus reads thus:

"To justify the inference of guilt from the fact of possession of stolen property, it must appear that the possession was personal, and that it involved a distinct and conscious assertion of possession by the accused."

In *State* v. *Drew,* 179 Mo. 315 (78 S. W. 594, 101 Am. St. Rep. 474), the defendant was charged with burglary and larceny in a store. Among other things stolen were some pieces of cloth, one of which was found in the defendant's residence locked up in a trunk the key of which was in the custody of his daughter. The court held that:

"The finding of recently stolen articles on the premises of a man of a family, without showing his actual, conscious possession thereof, discloses only a *prima*

*facie* constructive possession, and is not such a possession as will justify a presumption of guilt by reason thereof."

The same doctrine is taught in *State* v. *Warford,* 106 Mo. 55 (16 S. W. 886, 27 Am. St. Rep. 322); *Cooper* v. *State,* 29 Tex. App. 8 (13 S. W. 1011, 25 Am. St. Rep. 712); *Lehman* v. *State,* 18 Tex. App. 174 (51 Am. Rep. 298); *People* v. *Friedman,* 149 App. Div. 813 (134 N. Y. Supp. 153); *Ex parte La Page* (D. C.), 216 Fed. 256; *People* v. *Wilson,* 151 N. Y. 403 (45 N. E. 862).

In order to constitute larceny of the kind charged in the indictment there must be an asportation. The evidence was that all the cattle mentioned in the testimony were running at large on the public range or at least in places where cattle indiscriminately could and did go at will, and were so running at the time of the occurrence described by the witnesses. As stated, indeed, the testimony was to the effect that by far the greater part of the band where the cattle were found belonged to the defendant. One witness said about sixty were owned by another man and a few head in addition were the property of still other individuals. Under such conditions a felony is not to be imputed to the defendant respecting the animals in dispute on account of his owning the majority of the band. An inference might as well be drawn unfavorable to the owner of the sixty head. Under such circumstances, every animal is constructively in the possession of its owner and, as stated in *State* v. *Childers,* 71 Or. 340 (142 Pac. 333):

"Constructive possession cannot be in two people at the same time, whose interests are adverse to each other."

In short, there is nothing shown in the testimony
that amounts to a disturbance of the constructive pos-
session of whoever owned the cattle mentioned in the
indictment.    It is not shown that the defendant put his
brand on the cattle or authorized it to be done.   Al-
though it is not necessary to the case, yet it is proper
to state that he gave evidence of a disinterested wit-
ness to the effect that a branding iron of the defendant
had been stolen from a ranch where the witness was
employed and had been missed from there about a year
prior to the discovery of the cattle in question.   Un-
less there is some evidence tending to show that the
defendant either branded the cattle himself or author-
ized it to be done as an aid to his larceny of them, the
matter of finding his brand on the cattle must be laid
out of the calculation in a case like the one before us.
There is an utter absence of any testimony showing
an asportation necessary to constitute the crime of
larceny as charged in this indictment.

The court was in error in not directing a verdict for
the defendant on his motion at the close of all the evi-
dence in the case.   It is unnecessary to consider the
other assignments.   The judgment of the circuit court
is reversed and the cause remanded for further pro-
ceedings.   It is possible that the prosecution may be
able to make a better case at another trial, but a con-
viction cannot be sustained rightly on the record before
us.                          REVERSED AND REMANDED.

McBRIDE, C. J., and BENNETT and HARRIS, JJ., concur.

Original opinion reversing the judgment reaffirmed with modification March 30, 1920.

ON REHEARING.

(188 Pac. 702.)

*In Banc.*

This case has already been once before the court (182 Pac. 149), and a reversal was then ordered, upon the ground that there was no sufficient evidence to support the verdict.

There was a petition for a rehearing, the district attorneys for the districts of eastern Oregon generally joining therein as friends of the court. The petition was granted, and we have again carefully considered the questions involved, as presented at the second hearing.

ORIGINAL OPINION REAFFIRMED WITH MODIFICATION.

*Mr. George M. Brown,* Attorney General, *Mr. C. H. Leonard, Mr. R. I. Kestor,* District Attorney, and *Mr. T. S. McKinney,* District Attorney, for the petition, with oral arguments by *Mr. Brown, Mr. Kestor* and *Mr. Leonard.*

*Messrs. McCamant, Bronaugh & Thompson* and *Mr. Herbert P. Welsh, contra,* with an oral argument by *Mr. W. Lair Thompson.*

BENNETT, J.—The contention on behalf of the state, as we understand it, is that the mere fact that one man's brand is found upon another man's animal, is of itself, sufficient to support a conviction of the larceny, without any evidence direct or circumstantial

as to who placed the brand upon the animal, or connecting the defendant with the branding in any way.

There was nothing presented at either hearing which would seem to us to justify adopting so extreme a doctrine or one so contrary to all the elementary principles of criminal law.

The statute in relation to brands has reference to lawful branding—not to unlawful. It makes the brand primary evidence of ownership. There is nothing in its terms to raise the presumption that an unlawful and larcenous brand was placed upon an animal by any particular person.

Any person who rides upon a range has it in his power to brand a stolen animal with the brand of a third person or with any brand he sees fit. All he needs to do so is a horse, a rope, and a running-iron, or a stamp brand, all of which are easy to manufacture or obtain.

It is a well-known fact that owners of large bands of stock do not and cannot, in the nature of the business, do all the branding themselves. Many of them do not ride at all, or do any branding at all, but leave this entirely to their subordinates, who go out upon the range and gather and brand anything which they may believe to belong to their employer. These employees are subject to constant change. Some are discharged with more or less frequency, and others employed in their place. Often they are here to-day and gone to-morrow.

Where a cattleman owns a considerable number, it is utterly impossible in most cases to trace or identify his cattle, except by brand. If the mere presence of his brand upon the wrong cow were alone enough to convict him of larceny, it would be easy for any dis-

satisfied or discharged employee or any unfriendly and vindictive neighbor to send him to the penitentiary; and this would be especially true if he happened to be a man who was generally disliked or distrusted in the community.

We fully realize the importance of the livestock business in the sections of the state where there is still a public range and the loss which such industry suffers each year from the depredations of stock thieves and cattle rustlers in such locations. The very nature of the business, where stock run upon the common range and are only identified by brands and earmarks, makes the commission of such crimes easy and their detection difficult and sometimes impossible. With the prosecution and conviction of the guilty in such cases we have the fullest sympathy.

5. But the law must have regard to the protection of the innocent as well as the punishment of the guilty. We know of no case in which it has been held that the finding of one man's brand upon another man's cow is alone sufficient to justify a conviction, and we are not willing to create such a precedent.

We are not willing to write a new doctrine, contrary to all the elementary principles of the criminal law, and which will always imperil the innocent, in order to sometimes reach the guilty.

6. We must not be understood as holding that the fact that one man's brand is found upon another's animal, with or without a disfiguration of the old brands, has no evidentiary value. Such a circumstance of itself arouses the gravest suspicion and is entitled to the careful consideration of a jury. When connected with other evidence, either direct or circumstantial, tending in a substantial way to prove that the

defendant either placed it there, or authorized or directed the act, it would be entirely sufficient to support a verdict. But there must be such evidence tending to show that the defendant did or authorized the branding, or else a link in the chain is broken and the whole case falls apart.

It seems to be assumed by the prosecution in this case that, if there is any competent evidence, however inconclusive—any circumstance, however remote—which a jury would have a right to consider, if submitted along with other evidence—that there is "evidence to support the verdict" under our constitutional provision and therefore the verdict must stand.

7. A little consideration will, we think, demonstrate that this cannot be a correct construction of the constitutional provision. Evidence that the crime in question has actually been committed (by someone) is always and necessarily competent and admissible, in a prosecution against any particular person—yet if the state stopped there and offered no evidence to connect the defendant with the crime, no one would contend (although there was some competent evidence before the jury) that a verdict of guilty could be sustained. It is not merely "evidence" which can invoke the constitutional provision but evidence "to support a verdict."

This question was carefully considered by the court in *Schneider* v. *Tapfer,* 92 Or. 520 (180 Pac. 107), in which it is said:

"We think, however, the constitutional provision did not intend to go further than to prohibit the court from re-weighing the evidence and revising the verdict of the jury in cases where there was conflicting evidence, or substantial evidence, to sustain the verdict. * * We hold that evidence merely suggesting a

suspicion or possibility, does not bring the case within the constitutional amendment, but that there must be substantial evidence upon which a reasonable man might reach a reasonable verdict."

And Mr. Justice HARRIS says in an opinion concurring in the result:

"I acquiesce * * in the announcement that a verdict cannot be permitted to stand, if the evidence offered in support of it does no more than to raise a suspicion."

In *Martina* v. *Oregon-Wash. R. & N. Co.*, 73 Or. 283 (144 Pac. 104), Mr. JUSTICE RAMSEY, long after this constitutional provision was adopted, said:

"In order that a verdict may be supported by the evidence, there must be some legal evidence tending to prove every material fact in issue."

Here one of the material facts was that the defendant, either by himself or another, did place the brand in question on the animals described in the indictment, since there was no other proof of any taking.

In this connection Section 697, L. O. L., which has never been changed or amended, is particularly pertinent to criminal cases. It provides:

"That evidence is deemed satisfactory, which ordinarily produce moral certainty or conviction in an unprejudiced mind. Such evidence alone will justify a verdict. Evidence less than this is denominated insufficient evidence."

8. It is strongly urged that the circumstances under which the animals were found; the fact that so large a bunch of cattle (about 300) were found in one small valley; that they were upon a range used by the defendant as a sheep range; that the greater number of the cattle in the bunch belonged to the defendant;

that Silvers, the employee of defendant, was met in the vicinity coming from that direction, and that defendant had sent him up there to build a camp and wean the calves—connected the defendant with the branding. But it must be remembered that, according to the undisputed evidence of the state's own witnesses, the defendant had no exclusive cattle privilege on the range in question, but, on the contrary, it was open to everyone's cattle and was used in common by all.

If these animals had been found in defendant's immediate possession and control, as in his barn or sheds, or even, in some circumstances, in his field, a different question might arise, and there would, no doubt, be a presumption or inference that he was responsible for the disfigurement and rebranding. The case would then be analogous to the case offered on behalf of the state, as an illustration, where stolen property is found in the room occupied by a defendant. Here there was no such immediate possession or control.

If we assume (what was not proven but is probably true) that so large a number of cattle would not ordinarily be likely to congregate voluntarily in so small a place, then there might be a fair inference, from the facts of their being found there together with no one else in the vicinity, and that Silvers was met so near and coming from that direction, that he had gathered or rounded them up. This, however, would not of itself be anything unusual, nor would it show any exercise of ownership or possession of every animal in the bunch. It is a well-known fact in a cattle country, that it is impracticable, if not impossible, for a man who has a large number of cattle upon the range mixed with those of his neighbors, to separate them

one by one, as he finds them upon the range. It is the universal custom to round up everything, either for the purpose of inspection or separation, and then, when they are gathered in a bunch, they may be inspected, or the owner's cattle may be separated from the others, if that is the purpose of the round up.

In this case the undisputed evidence is, that the greater number of the cattle in this bunch bore the defendant's brands. But from one fifth to one fourth of them belonged to other neighbors, who had cattle upon this same range. No doubt the fact that the cattle were found gathered in one place, and with so many of defendant's cattle, was a circumstance to be considered by the jury, together with other evidence, if any had been offered, tending to connect the defendant with the re-branding; but it was not such an exclusive possession as would justify the presumption of theft by the defendant. If the cattle had been found with the brands freshly burned or their ears and dewlaps fresh and bleeding from the disfigurement, there might have been a just inference, from the circumstances, and the fact that Silvers was met coming from the immediate vicinity, that he was the party who had made the changes. But here, as we read the record, there was no claim that the disfigurement was immediately fresh. The evidence seems to show that the blotch designated as the "frying-pan brand" had been, probably, placed on the animal a few weeks before. One other brand was thought to have been made that season, and the remainder were old brands made one or two years before.

9. It must be remembered also, that even if Silvers had been proven to have done the rebranding, it would still have been necessary to connect the defendant with

the act, and show by direct or circumstantial evidence that he authorized or directed it, or in some way participated therein before he could be convicted of the crime. Authority to commit a criminal act can never be inferred from the mere fact that the alleged agent is in the lawful employ of the defendant.

In 16 C. J., page 123, Section 106, the law, in relation to this is epitomized as follows:

"The civil doctrine that a principal is bound by the acts of his agent within the scope of the agent's authority has no application to criminal law. Therefore, the mere relation of principal and agent or of master and servant does not render the principal or master criminally liable for the acts of his agent or servant, although done in the course of his employment; it must be shown that they were directed or authorized by him. Moreover, a clear case must be shown."

The only other fact which is claimed to strengthen the case against the defendant is the fact that, when the cattle were gathered in the corral at Lakeview, he said, "Some of them are mine," and that on the witness-stand the defendant testified that he thought two of the animals, and possibly three, were his because his brand upon them seemed to him to be the oldest. He did not claim to know or identify the particular animals by their general description, and only claimed them upon the ground that his brand seemed to be the older.

One of these two, the frying-pan cow, was not proven in any way to belong to the persons charged in the indictment, and there was no evidence whatever that she had any other brand than the brand of the defendant, the points of which seemed to project below the blotch. The other one was a steer branded in defendant's brand above which was a comparatively

fresh brand designated as a "lazy 18." There was some evidence that there had been another brand under the "18," but no witness was able to speak with certainty as to what it had been. The nearest that any one came to identifying the brand underneath the "18" was the witness Hotchkiss, who testified:

"I don't know what else was under this 18; I think it was an 'FG,' but don't know whether it was or not."

And on cross-examination:

"Q. Could you distinguish any brand under that 18, or what were the indications to you that there was another brand there? Could you trace it out or what?

"A. No, I don't believe I could."

All the other witnesses for the prosecution testified flatly that they could not tell what brand was underneath the "lazy 18," and all agreed that the defendant's brand was haired over and an older brand than the "18." The owner of the "18" brand (if there was any such brand in the neighborhood) was not called as a witness, and there was no evidence that there was no such brand thereabout.

10. We do not think that under the circumstances, the claim of the defendant that he thought some of these cattle were his, was sufficient evidence to connect him with any certainty with the disfigurement of the brands. There was no evidence that the defendant himself ever rode upon the range, or did the branding of his cattle himself, and the only evidence in that regard, is his own evidence that he did not. There is no evidence that he had ever been in the vicinity where the cattel were found, except his own statement that he was up there once, a few weeks before these cattle were taken off of the range. There is no evidence that he ever sold or disposed of any of them,

or attempted to do so. No evidence that he ever had them in his pastures in the fall or in his feed lots in the winter. There is no circumstance which even tends to show that he was present at the branding of any of these animals or authorized or directed it. There is nothing but the mere fact that the animals were found running with some of his cattle, together with other cattle, upon a range free to anyone who wished to use it, and that someone had placed a brand belonging to him thereon.

After very full and careful consideration, we can see no way by which we can lawfully and consistently avoid reaffirming the conclusion reached at the original hearing, that the chain of evidence offered by the prosecution has failed in an important link, and does not prove that the defendant was the person who did the branding in question. In short, while the evidence is ample to create and support a grave suspicion against the defendant, it does not point to him with the unerring finger of moral certainty, which will alone sustain a conviction in a criminal case. There is one expression, however, in the original opinion which, upon more careful consideration, we think should be modified.

11. Where there are two brands upon an animal, one older than the other, we think the natural presumption from the brands alone would be that the ownership of the animal belonged to the older brand, and that ordinarily under such conditions the burden would be upon the owner of the later brand to establish his right to put his brand upon the animal. The statute in relation to brands is silent as to this matter, and in our view it should be decided in accordance with the analogies of the common law. The first brand establishes ownership at one time and we think the presumption

of continuance should apply until a change of ownership or other evidence of ownership is shown. It is much like proof of ownership by possession. It is well settled that, where two parties depend upon possession as proof of ownership the older possession prevails over present or later possession.

In Lawson on Presumptive Evidence, page 492, the rule is laid down as follows:

"The possession of real or personal property raises a presumption of title."

And in the same work at page 210, it is said:

"Where a person is proved to be the owner of personal property with the present right of possession, the presumption is that he continues to be the owner until there is evidence that he has parted with that ownership."

See, also, *Magee* v. *Scott,* 9 Cush. (Mass.), 148 (55 Am. Dec. 49), and *Davis* v. *Insurance Co.,* 36 N. Y. Supp. 792 (15 Misc. Rep. 263).

If this were not the rule in relation to branded animals, it would be very disturbing to the title to such property in the range country. There, as a rule, no man knows his animals except by the brand, and if a thief or wrongdoer could neutralize the evidence of the previous brand by putting on a fresh one, it would seldom be possible for the true owner to prove his ownership. If a large owner was occasionally selling some of his cattle, and someone should place a brand upon some of his range stock, he would be compelled to prove the negative that he had not sold the particular animal, which would generally be impossible. If a cattle owner should die, any evilly disposed person might put a fresh brand on half his bunch, and it would be impossible to prove that the deceased owner

had not, at some time, sold the animals. The purchaser, on the other hand, can generally easily prove the affirmative fact that he has purchased the stock in question, and, if necessary, he can always protect himself by taking a bill of sale.

The first brand upon range cattle, is almost invariably placed upon them when they are calves at their mother's side, and when the ownership can be easily ascertained. We think the better rule, and the one followed by cattlemen generally, is that there is a presumption in favor of the first brand. Of course, this is a disputable presumption and will yield readily to either direct or circumstantial evidence. As was said in the original opinion, the evidence was entirely sufficient to go to the jury as to the ownership of most of the cattle involved in this case.

We think the case should be sent back for a new trial in the event that the district attorney shall find himself able to strengthen his case. We will therefore proceed to notice the other claims of error which are likely to arise upon a new trial, and which are not sufficiently covered by what has already been said.

12. We do not think there was any error in permitting the witnesses for the state to testify as experts, in relation to the growth of brands with the growth of the animal, and the effect of a second burn upon the old scar. These witnesses were old cattlemen of long experience and the weight of their testimony was for the jury. There was no error in permitting Dick to testify as to the brands upon the other animals in the bunch where these were found.

We think there was no reversible error in giving the instruction in relation to the testimony of defendant. It might have been just as well if the court had

95 Or.—41

left out the word "only" from such instruction, but we think on the whole the charge was within the rule established by the decisions of this court: *State* v. *Clements,* 15 Or. 237 (14 Pac. 410) ; *State* v. *Bartlett,* 50 Or. 440 (93 Pac. 243, 126 Am. St. Rep. 751, 19 L. R. A. (N. S.) 802).

13. The court instructed the jury as follows:

"If you believe from the evidence and beyond a reasonable doubt, that the William Hanley Company is the owner of the brand 'LY' placed on the left hip of an animal, a record of which has been introduced in evidence, and that while it was so the owner of such brand, it placed the same on any of the animals mentioned in the indictment, then I charge you that it is *sufficient* evidence that the animal or animals so bearing said brand, is the property of said William Hanley Company, unless there is some other evidence to the contrary."

—and gave a like charge as to the cattle alleged to have been the property of the Eastern Oregon Live Stock Company. We are of the opinion that this instruction went too far and invaded the province of the jury.

The law in relation to brands to which we have already alluded, makes the brand of a stock owner *prima facie* evidence of his ownership, and such evidence is *sufficient to go to the jury.* But whether it is sufficient under all circumstances to *satisfy the jury beyond a reasonable doubt,* is a matter for it to decide. Nearly all of the animals in question here had two brands and as to some of them, at least, there was a controversy as to which was placed there first. Under these circumstances the court ought not to have told the jury that, if the Hanley Company "placed its brand on any of the animals, it is *sufficient* evidence" that the animals belonged to that company. The court

should have told the jury that such evidence was sufficient to justify a verdict in that regard, if, under all the circumstances, it satisfied them beyond a reasonable doubt of the ownership.

There was no error in refusing charge No. 6, which was entirely too broad.

The seventh instruction asked for by the defendant is elementary, and we see no reason why it should not have been given, although it may possibly have been sufficiently covered by the general charge.

14. The ninth instruction asked by the defendant was too broad and was properly refused, and the same is true of No. 10. These instructions are based upon the idea, that because an unrecent or unexclusive possession of stolen goods is not sufficient alone to justify a conviction, such facts cannot be considered by the jury at all. On the contrary, such facts are obviously circumstances which the jury had a right to consider, although they are not sufficient alone to raise a presumption of guilt.

The sixteenth instruction asked by the defendant was too broad and was properly refused.

ORIGINAL OPINION REAFFIRMED WITH MODIFICATION.

BENSON, J., took no part in the consideration of this case.