STATE *v.* BARNES

(44 P. (2d) 1071)

*H. H. DeArmond,* of Bend, and *George H. Brewster,* of Redmond (Upton & DeArmond, of Bend, on the brief), for appellant.

*Bert C. Boylan,* District Attorney, of Bend, for the state.

RAND, J. On the evening of April 29, 1934, the defendant shot and killed Knute Lunden. The homicide occurred in the dwelling house on Lunden's farm in a remote part of Deschutes county about five miles from the town of Lapine. There were no eyewitnesses to the killing. The defendant admitting the killing but claimed to have acted in self-defense. The defendant was tried and convicted of the crime of murder in the first degree and, on recommendation of the trial jury, was sentenced to life imprisonment. From this judgment, he has appealed.

At the opening of the trial, the defendant, by his attorney, moved the court that the jury be directed to view the scene of the homicide before the introduction of the testimony. This motion at the time was denied, but at the close of the testimony the jury was taken to the scene of the homicide and an inspection made of the premises in the presence of the court, the district attorney, the defendant and his counsel.

The defendant contends that it was error for the court to deny the view at the opening of the trial and also contends that, because the rooms were not large enough to permit all the jury and the court to be in the same room at the same time, by this separation of the jury he was deprived of a substantial right.

■ The question of whether a jury in a given case should be permitted to view the premises at all, or, if permitted, at what stage of the proceedings the view should be taken, is wholly a matter within the sound judicial discretion of the trial court and will be reviewed only for an abuse of discretion: *Southern Oregon Orchards Co. v. Bakke,* 106 Or. 20, 27 (210 P. 858). Our statute, section 2-302, Oregon Code 1930, provides:

"Whenever, in the opinion of the court, it is proper that the jury should have a view of real property which

is the subject of the litigation, or of the place in which any material fact occurred, it may order the jury to be conducted in a body, in the custody of a proper officer, to the place, which shall be shown to them by the judge or by a person appointed by the court for that purpose. While the jury are thus absent, no person, other than the judge or person so appointed, shall speak to them on any subject connected with the trial.''

■ The fact that, because of the physical conditions existing at the time, it was impossible for the twelve members of the jury and the trial judge, all together, to make an inspection of the rooms at one time, could not operate to harm the defendant in the absence of some misconduct upon the part of the jury while so separated. Had there been any such misconduct, the defendant, upon the return of the jury to the courtroom, could have moved the court to open up the case and have called witnesses to establish that fact, but neither the state nor the defendant requested the court to permit any additional testimony to be taken either for the purpose of showing what had occurred during the inspection or in explanation of any fact or circumstance disclosed by the view. Later and by an affidavit in support of a motion for a new trial, certain facts were alleged and the overruling of the motion is assigned as error. A careful consideration of the affidavit convinces us that, if all that is said therein be true, there was no misconduct upon the part of the court or jury in the inspection of the premises.

The defendant also assigns error in the refusal of the court to direct the acquittal of the defendant. Stated briefly, the evidence shows that, some months prior to the homicide, the decedent, who was then living alone upon his farm, permitted the defendant to move with his wife and grandchild to decedent's home under an

arrangement that the defendant's wife was to do the cooking and housework and, during decedent's absence, the defendant was to do the chores upon the farm, and this arrangement continued until the time of the homicide. On the day of the homicide, which was Sunday, decedent drove his automobile to Lapine, taking with him the defendant, his wife and grandchild. While there they went to Yager's service station, remaining about two hours, where they purchased and drank nine small bottles of beer, the defendant, his wife and decedent each drinking three bottles thereof. They then got into the car and started to return home, the defendant driving.

According to the testimony of the defendant and his wife, after they had proceeded a short distance and just before turning into the side road which led to decedent's farm, defendant and decedent got into some altercation, each striking the other, and it is claimed that decedent drew a knife, but there is no claim made that he attempted to use it. The parties then left the car and the wife and grandchild returned afoot to the service station. When she reached there, she notified certain parties of the altercation, saying that the decedent had a knife and was trying to kill her husband. These parties immediately left in an automobile to drive to decedent's home and met the defendant a short distance therefrom, carrying a rifle, and he informed them that he had killed the decedent. They all went on to decedent's home and found him dead.

The defendant's version of the altercation was that the decedent was intoxicated and that for that reason defendant drove the car; that while so driving the decedent struck him in the face with his fist and that they then fought in the car which had been brought to a stop; that they all got out, that decedent had a

knife and that the defendant picked up a club to defend himself; that they then talked together and settled the controversy and the two of them then got back into the car, the defendant driving, and started for decedent's home. On the road to the house, they had to go through three gates and decedent opened and closed each of them, the last gate being a short distance from decedent's house. When the last gate was closed, defendant had a "premonition" that the decedent, who, after closing the last gate, was proceeding toward the house, would go into the house and get a loaded rifle, which was then in the bedroom occupied by defendant and his wife, and shoot him. That he parked the car, immediately followed the decedent into the house, did not see him in the kitchen as he passed through, went into the bedroom, took down the rifle, went out in the hall and started to go out the front door but, finding it locked, he turned and saw the decedent with a pistol held in his two hands; that defendant then shot the decedent twice, the first shot causing him to fall on his knees and the last shot to fall on the floor. Defendant does not claim that the decedent fired the pistol or held it in a position for firing.

The only other testimony offered by any witness in respect to this altercation was that of a truck driver, who happened to be passing along the highway about one hundred feet from where decedent's car had been stopped. He said that he saw decedent and defendant standing by the side of the road and that decedent's face was bleeding.

The defendant and his wife both testified that in this altercation both defendant's and decedent's faces were bruised and bleeding.

■ In addition to this testimony, there was the testimony of the officers and numerous witnesses showing

the condition of the house, certain bullet marks, and how the body was lying immediately following the homicide and that under the leg of the decedent a pistol was found which had been recently discharged and which had no blood on it. There was ample evidence to support the verdict and to establish the guilt of the defendant and, therefore, the motion was properly overruled.

■ The defendant contends that the court erred in refusing to give certain instructions requested by the defendant upon the law of self-defense. Although the court refused to instruct in the language of the requested instructions, the court fully and fairly stated the law of self-defense in respect to all the matters requested. The instructions in respect thereto were as follows:

"* * * What is known as self-defense, —the right to take human life in self-defense, is founded upon necessity, real or apparent, and it can only be resorted to when the circumstances warrant a reasonable belief in the person assaulted, if assaulted, that the killing is necessary to preserve his life or to protect him from great bodily harm. Self-defense is essentially a preventative remedy to be used only to prevent and repel clear and apparent danger of death or great bodily harm. It can never lawfully be used as a means for vengeance or for real or fancied wrong, or for the purpose of retaliation or revenge. There are certain essential elements of self-defense to which your attention is now directed. The assailer must have been reasonably without fault in bringing on the difficulty which resulted in the death of the deceased. He must have believed at the time that he was in such imminent danger of death or great bodily harm as to make it necessary to take the life of the assailant to save his own or to protect him from great bodily harm. The circumstances must have been such as to warrant such a belief in the mind of a person of ordinary reason and

firmness in the situation in which he was placed, and it must have appeared to him that there was no other reasonable means of avoiding or declining the combat, if any you find.

"If you find from the evidence that the defendant was assaulted or in danger of being assaulted by the deceased, it was his duty to employ all reasonable means within his power, consistent with his own safety, to avoid the danger and avert the necessity of taking the life of his assailant. But if you find from the evidence that the defendant provoked the assault, or if he was the aggressor in the affray, he cannot justify the killing on the ground of self-defense, unless after provoking the difficulty he was endeavoring to withdraw from it. In such situation he would be precluded by his conduct of availing himself of the necessity which was self-imposed and which he brought upon himself.

"You are instructed that imminent danger means immediate danger, danger that is urgent and which must be instantly met, —danger that cannot, apparently, be avoided by adopting incidents less violent than that of taking human life.

"You are instructed that the law regards human life as the most sacred of all interests committed to its protection, and there can be no successful setting up of self-defense unless the necessity of taking life is actually present and urgent, unless, in a word, the taking of his adversary's life is the only reasonable resort of the party to save his own life or his person from great bodily harm, or if from all the circumstances he had reasonable grounds to believe his life or person was in great danger. The right of self-defense does not imply the right of attack and will not avail in any case where the difficulty was induced by the party himself.

"In determining whether the deceased was killed by the defendant under the reasonable apprehension of death or great bodily harm, you should consider what would be the reasonable apprehension of the defendant in the situation in which, from the evidence, you find him at the time of the alleged killing of

Lunden. You should consider all of the evidence relating to the position of the deceased and the defendant —that they were in at the time of the alleged commission of the crime, together with all of the evidence bearing upon the scene of the conflict, as you have received it in the evidence produced. You should determine whether the defendant acted in the honest and reasonable belief that it was necessary to take the life of the deceased to preserve his own life or to protect him from great bodily harm. He had the right to act upon appearances if they would lead an ordinarily reasonable and prudent person in his situation to apprehend imminent danger to life or limb and to resist such apparent imminent danger with sufficient force to repel the same. But the danger must have been so urgent that the killing was actually or apparently necessary to avert it.

"Whether there was real or apparent imminent danger of death or great bodily harm existing at the time of the fatal wound inflicted upon Lunden is a question for you to determine from all of the evidence in the case and the circumstances attending the affray, if you find there was an affray.

"If you find from the evidence that the defendant killed the deceased under such condition as warranted and caused a reasonable belief on his part that he was in imminent peril of life or great bodily harm, that he did not have a reasonable opportunity to escape and to avoid the affray, and that he killed the deceased to preserve his own life or to protect himself from great bodily harm, under the reasonable belief on his part that it was necessary for this purpose, then the defendant killed Lunden in self-defense, and you should return a verdict of not guilty. The reasonableness of this belief is to be determined from his standpoint, but it is a question for you, gentlemen of the jury, as to whether he had sufficient grounds upon which to base such a belief. But if you are satisfied beyond a reasonable doubt, as I have heretofore defined the same to you, that this defense has not been established, then you should disregard it. The plea of

self-defense does not, however, cast the burden of proof upon the defendant. The burden remains upon the state and it does not shift. So, if you have a reasonable doubt as to whether the defendant killed the deceased in self-defense, you should resolve that reasonable doubt in favor of the defendant and acquit him.

"I instruct you further that in determining who was the aggressor in this difficulty, if you find there was a difficulty there at the house, that evidence of uncommunicated threats, which may have been made by the deceased, if you find that they were so made, are admissible and have been admitted for the purpose of showing the motive, nature and character of the deceased and for the purpose, likewise, of showing who was the aggressor in the difficulty which subsequently ensued, if you find there was a difficulty or an affray between the defendant and the deceased at the house.

"The jury are instructed that where a homicide is committed under such circumstances as to raise a question in your minds whether or not on the one hand the act of killing was committed maliciously, or whether, on the other hand, it was committed from a well-grounded apprehension of death or great bodily harm, it is proper that the jury should consider the fact, if it be a fact, that the general reputation of the deceased was violent or dangerous in determining whether defendant had reasonable cause to apprehend death or great bodily harm, but the circumstances of the case must, at least, raise a doubt in regard to the question of whether the defendant acted in self-defense. However, in considering the fact, if it be a fact, that the reputation of the deceased was violent or dangerous, you are charged that such reputation cannot be established by proving, or are you authorized to consider, single, isolated or unlawful acts on the part of the deceased, which form no part of the material circumstances surrounding this particular homicide. You are charged, in connection with the foregoing instruction, that it is no excuse for murder, or manslaughter, that the person killed was a bad man, because in the eyes of the law it is as great an offense to kill a bad man as it is to kill a good man. I will read that again. I

have got the connection there wrong: Where I left off —to kill a dangerous or violent man as it is to kill a mild or inoffensive man, and unless the circumstances show that the defendant acted in self-defense, or was in imminent danger of death or great bodily harm, the bad character of the deceased, if it was bad, will not avail the defendant.''

■ The defendant excepted to that part of the instructions above quoted as follows:

''If you find from the evidence that the defendant killed the deceased under such condition as warranted and caused a reasonable belief on his part that he was in imminent peril of life or great bodily harm, that he did not have a reasonable opportunity to escape and to avoid the affray, and that he killed the deceased to preserve his own life or to protect himself from great bodily harm, under the reasonable belief on his part that it was necessary for this purpose, then the defendant killed Lunden in self-defense, and you should return a verdict of not guilty.''

This, the defendant contends, was equivalent to saying that it was defendant's duty to flee and that, if by fleeing, he could have avoided the necessity of taking the life of Lunden, he would not be entitled to claim self-defense. We do not place that construction upon the charge. Nor do we think the jury could have been in any way misled by the language objected to.

According to the defendant's own testimony, the altercation was entirely over when the parties reached decedent's place and nothing had occurred between them during the three or four miles they were riding together to indicate any intention upon the part of the decedent to renew the quarrel. There was not a fact or circumstance testified to by the defendant to justify the defendant's so-called ''premonition'' that decedent was going into the house for the purpose of getting a

rifle or that he had any intention of using it, and when decedent had entered the house he made no attempt to get the rifle as he could have done, but, on the contrary, the defendant rushed in after the decedent, took down the rifle and shot him immediately. Under defendant's own testimony, the defendant was the aggressor and could have avoided the affray, if there was one, had he desired to do so. The evidence indicates that the defendant followed the decedent into the house and armed himself for the purpose of taking decedent's life and that he carried this design into immediate execution.

Finding no error in the record, the judgment of the lower court is affirmed.

CAMPBELL, C. J., not sitting.